IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| WILLIE GONZALES, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 5:17-cv-215-DAE |
| § | |
| INMATE CALLING SOLUTIONS, LLC, § | |
| § | |
| Defendant. § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

### I.
### PARTIES

1. Plaintiff **WILLIE GONZALEZ** is a resident of Bexar County, Texas in the Western District of Texas, San Antonio Division.

2. Defendant **INMATE CALLING SOLUTIONS, LLC** (herein after referred to as "Defendant" or "ICS"), is a Foreign Limited Liability Company doing business in Bexar County, Texas in the Western District of Texas, San Antonio Division. Defendant has been served, answered, and removed this matter to federal court.

### II.
### JURISDICTION AND VENUE

3. Plaintiff's claims arise under both federal statute and state law. This Court has jurisdiction over the claim because Plaintiff has asserted claims for discrimination, harassment and retaliation arising under federal law, including the Americans with Disabilities Act of 1990 ("ADAAA"), as Amended, based on disability discrimination and retaliation, and the Family Medical Leave Act ("FMLA"), based on interference and retaliation, in addition to claims

1

under the Texas Labor Code. Plaintiff now amends his pleadings to allege violations of the Fair Labor Standards Acct ("FLSA").

4. This Court has jurisdiction to hear the merits of Plaintiff's claims due to the federal question raised pursuant to the federal statutes cited above.

5. Venue is proper in the Western District of Texas, San Antonio Division, because the events or omissions forming the basis of the suit occurred in this District. Venue is proper in this Court in that the Defendant conducts business in the division.

6. As of the time of filing, damages are within the jurisdictional limits of the court.

## III.

## MISNOMER / MISIDENTIFICATION

7. In the event that any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification" or "misnomer" and/or such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## IV.
## FACTS

8. Mr. Willie S. Gonzales was hired on or around March 12, 2012 by ICS as Tech Support.

9. On or about April 28, 2015, Mr. Gonzales was involved in a car accident. Mr. Gonzales suffered injuries and disabilities to his neck, back, shoulder, and migraines. Mr. Gonzalez was diagnosed with Cervical Thoracic Lumbar, Shoulders, Arms Sprain and Strain. As a result, Mr. Gonzales's following major life activities were substantially limited: walking, sitting, bending, lifting, concentrating, thinking, and reading.

10. Mr. Gonzales requested and used leave for his disabilities and resulting treatment from April 28, 2015 to July 27, 2015. Mr. Gonzales further required intermittent leave for doctor's

appointments and treatment after July 27, 2015.

11. Throughout his treatment, Mr. Gonzales contacted ICS to keep them in the loop during his application for FMLA and Short Term Disability. HR Representative Kristin Hess was kept up to date with Mr. Gonzales' treatments and received doctor statements at least monthly while Gonzales was out from April 28, 2015 through July 27, 2015.

12. Mr. Gonzales explained to HR Representative Hess the anticipated healing process and time frame he would require, including medication he would be taking and surgery he would potentially need to undergo.  Mr. Gonzales further explained to HR Representative Hess that he had to take his pain medication at night because it made him too groggy to take during the work day, so he would not be able to take on call phone calls at night.  HR Representative Hess assured Mr. Gonzales that ICS would work with him and approved his intermittent FMLA leave and Short Term Disability.  Short Term Disability was approved for a 9 day period of time, and, after exhausted, Mr. Gonzales was told he could use any Paid Time Off he had left. HR Representative Hess informed Gonzales that he would be docked pay for days that he missed or had to leave work early for his disability unless he got the absences pre-approved. Hess assured him that those days would not be held against him unless they ended up being multiple consecutive days over an extended period of time for more than 5 days, at which point he would be required to bring in a doctor's note.

13. Mr. Gonzales continued treatment with Dr. Hector Samaniego, but after weeks of treatment the pain began to get worse. Mr. Gonzales was sent for an MRI, which revealed that Mr. Gonzales had intrusions and hemorrhages in his neck, changing his diagnosis to Cervical Herniated Discs.  Mr. Gonzales began receiving Spinal Epidural steroid injection treatments to help with hemorrhages. Mr. Gonzales continued to seek treatment from several doctors and

specialists for his injuries and is prescribed medication for his pain.

14. On July 27, 2015, Mr. Gonzales returned to work. Mr. Gonzales and the Tech Support Department had a new manager, Latoya Coleman, who reported to Director of Telecommunications Brian Dietert.

15. Mr. Gonzales under estimated the pain he was in when he had returned to work. Although the Spinal Epidural steroid injections helped reduce hemorrhaging, the pain from intrusions and spasms was still severe. Mr. Gonzales never missed consecutive days, but did call in on days when the pain was too severe and occasionally left early due to pain. Mr. Gonzales filled out and signed a "Family & Medical Leave (FML) Weekly Intermittent/Reduced Schedule Leave Update Sheet" each time he missed any work. Mr. Gonzales then got the signatures of his management team and faxed the documentation to HR Representative Kristin Hess.

16. On or around August 26, 2015, Mr. Gonzales received approval to use PTO from September 11, 2015 to September 14, 2015 to move into a new apartment. He needed help moving due to his disabilities and inability to lift anything.

17. On September 09, 2016, Tech Support Manager Latoya Coleman asked Mr. Gonzales to start taking calls from the on call phone system. Through the system, Tech Support answered calls from prison and jail VPN's into the ICS system at all hours of the night. If a Tech Support employee of ICS receives a phone call through the system, on call employees are expected to wake up and answer. Mr. Gonzales explained to Tech Support Manager Coleman that due to the medication he takes for his injuries he had trouble waking up during the night from being in a medication slumber, so he would allow the call to pass to the secondary or third employee on call. Mr. Gonzales further reminded them that he had informed Human Resources about his condition and how it made him groggy at night. Tech Support Manager Coleman instructed

Mr. Gonzales that Director of Telecommunications Brian Dietert would not allow Mr. Gonzales to not take the phone calls at night because Gonzales' doctor's note did not mention on call phone calls. If he were to fail to answer the phone, he was told by Tech Support Manager Coleman that if he would be written up and terminated.

18. Mr. Gonzales requested to contact his doctor to see if he could get the required accommodation paperwork specifying whether or not he could take the call, but was told he had to get it done on or before the following day, September 10, 2015. Mr. Gonzales contacted his doctor and was given a standby appointment because his doctor was not in the day he called. Mr. Gonzales was required to miss time at work to go to his doctor's office ad get the required doctor's note, which stated Mr. Gonzales could not take on call phone calls at night because of his medication. Mr. Gonzales provided the doctor's note to Director of Telecommunications Brian Dietert, who voiced that he was not happy with the fact that Mr. Gonzales was approved by his doctor to not take calls while under his medication.

19. On September 29, 2015, Mr. Gonzales was called into a meeting with Tech Support Manager Coleman, Human Resources Representative Liz Estrada, and Human Resources Representative Kristin Hess, who appeared by phone. Mr. Gonzales was informed he was receiving a written reprimand because of his absences. Mr. Gonzales tried to get clarification on what absences he was being reprimanded for, and was told they were the same absences he had called in for or left early. For every alleged absence, Gonzales had filled out a "Family & Medical Leave (FML) Weekly Intermittent/Reduced Schedule Leave Update Sheet," which was then approved. All of the absences were specific to treatments, doctor's notes, and/or pain from his medical disabilities. Some of the alleged absences were on days ICS had approved Mr. Gonzales for Short Term Disability and he had been told by Human Resources

Representative Hess that the days would not be held against him. The reprimand specifically addressed perceived behavioral issues along with the alleged unexcused absences. Mr. Gonzales requested to know why he would be written up for behavior or medical absences, and was told by both HR Representatives Estrada and Hess that generally ICS does not enforce ICS' attendance rule with reprimands, but, moving forward, it was going to be enforced. Mr. Gonzales asked when was the decision or rule to start enforcing this policy or rule implemented. ICS HR Representative Estrada stated that it didn't matter when they decided to enforce it. Mr. Gonzales expressed that it mattered to him, to which Estrada replied by rolling her eyes and saying, "I don't know, back in August?" Mr. Gonzales pressed for an answer on what day in August, and was told that it was August 1st, but it again doesn't matter "we are enforcing it now."

20. At the end of the meeting, Mr. Gonzales was told if he missed any more days it would be held against him, he would be written up and then terminated. Mr. Gonzales stated that this was the opposite of what he had been told by human resources and that he believes that this was an inequitable enforcement of a new rule without a warning first, particularly because the dates held against him were back dated. Mr. Gonzales was told he had to sign the reprimand and go back to work and that he needed to avoid missing any more days for the year.

21. One of Mr. Gonzales' coworkers, "Richard," informed Mr. Gonzales that Director of Telecommunications Brian Dietert told Richard he was going to get rid of Mr. Gonzales, but was running it by Centric Human Resources Representative Estrada first. Richard was aware of Mr. Gonzales' written reprimand, and told Mr. Gonzales that the allegedly newly enforced rule was only being enforced against Mr. Gonzales.

22. Mr. Gonzales again spoke with Human Resources Representative Hess, explaining that these

were not the accommodations she said he would have with his disabilities. Mr. Gonzales told Hess he felt discriminated against and singled out because of his disability. Gonzales tod Hess that he would have just applied for Long Term Disability if he had known he would have a target on his back for taking medical leave. Human Resources Representative Hess stated that she submitted paperwork for LTD, but that Mr. Gonzales was denied because ICS should have known Gonzales did not qualify because he had returned to work. Mr. Gonzales tried to appeal the decision, but it was denied.

23. On Dec 22, 2015, a server went down 15 minutes before the end of Mr. Gonzales's shift. Mr. Gonzales and his two co-workers, "Josh" and "Lorena," addressed the problem based on the specific training provided by ICS. The server was back up in approximately 35 to 45 minutes.

24. On December 23, 2015, Vice President of Technology John Goetsch called Josh, Lorena, and Mr. Gonzales into Goetsch's office. Goetsch complained that the server was not back up fast enough. After his speech, Vice President of Technology John Goetsch pointed to the baseball bat over his desk and said, "Next time I'll use this to get the results I want". Then Goetsch stated if need be he would involve HR to get rid of Mr. Gonzales.

25. Vice President of Technology John Goetsch made it a point to scream and yell at Mr. Gonzales on a regular basis, which was witnessed by Mr. Gonzales' co-workers and managers. Goetsch even threaten to take the baseball bat against Mr. Gonzales' head. The threat of physical violence caused Mr. Gonzales to have increased anxiety and panic attacks. Mr. Gonzales was concerned that the way his cubicle was set up he couldn't see from his desk Mr. Goetsch approaching.

26. On January 06, 2016, Tech Support Manager Coleman and Mr. Gonzales had a telephone conference with Human Resources Representative Hess. Hess was under the impression that

Mr. Gonzales was waiting until the last minute to request time off for doctor's appointments. Hess informed Gonzales that he needed to give five days notice. Mr. Gonzales clarified with her that he was in fact getting approval five days or earlier for all doctor's appointments, but Tech Support Manager Coleman could not mark anything in the time clock system, KRONOS, more than five days in advance. Tech Support Manager Coleman did not dispute this assessment of the KRONOS system when asked by Hess. Human Resources Representative Hess explained to Mr. Gonzales that there was a new rule being enforced as to absences: If Mr. Gonzales got time approved five days in advance, it would not be held against him; the time clock would read "unpaid: excused." Until Mr. Gonzales' PTO, which had been exhausted, was restored in March, any absences, whether approved or not, would be denoted as "unpaid: unexcused" on time cards. Hess explained the new rule was not being implemented until March, and, after he exhausted his new PTO, it would be enforced against Mr. Gonzales. After the teleconference, Tech Support Manager Coleman stated that she was unaware of such a rule, but would send out an email related to the new rule.

27. On or around January 10, 2016, Mr. Gonzales reported to Centric Director of Human Resources Sara LaMartina, out of St. Louis Missouri. Mr. Gonzales reported all of his concerns related to his absences, reprimand, disability discrimination, harassment, medical leave, the changing of the rules, and the threats against him by Vice President of Technology John Goetsch. Mr. Gonzales told LaMartina that he had been told by Richard that ICS was trying to find a reason to fire him and that ICS was using Gonzales' disabilities against him. Mr. Gonzales also reported that he was being pressured to take on call phone calls while under the influence of medication for his disabilities.

28. On or around January 11, 2016, Centric Director of Human Resources LaMartina contacted

Mr. Gonzales via email and then again by phone call, stating that Centric took threats of violence seriously. LaMartina flew down to San Antonio to investigate Mr. Gonzales' claims and also the claims of another employee who claimed he was threatened to be hit in the head with a baseball bat by Vice President of Technology John Goetsch. On the same day, LaMartina set up a meeting between herself, Mr. Gonzales, Tech Support Manager Coleman and ICS President Tim McAteer. In this meeting, Centric Director of Human Resources LaMartina expressed that the meeting would be confidential and that Mr. Gonzales had nothing to worry about. Vice President of Technology Goetsch was being asked to take his baseball bat home and would be talked to about anger issues. LaMartina further informed Mr. Gonzales that Director of Telecommunications Dietert had been updated on policies and procedures and Dietert would also be updating everyone else on policies and procedures. After the discussion, LaMartina made it clear there would be no further action taken. Mr. Gonzales said he wasn't just concerned about the baseball bat but also the man who threatened to use it. Mr. Gonzales asked "If I had publicly shamed, bullied, harassed, or threaten employees with violence with my baseball bat, would have you just asked me to chill out and take the bat home or would you have fired me?" LaMartina replied with "well I cannot answer that because we are not in that situation."

29. Mr. Gonzales left the meeting and found out that none of it had been confidential. Mr. Gonzales' co-workers were further aware that Gonzales wrote a letter to Centric HR. Mr. Gonzales was informed that he had now kicked a hornet's nest and Director of Telecommunications Dietert was gunning for Mr. Gonzales.

30. On or around January 13, 2016, multiple emails started coming from management on all the policies that were going to either be enforced or newly implemented.

31. On or around January 18, 2016, Tech Support Manager Coleman sent out an email on ICS Guidelines/Procedures. The policy that Human Resources Representative Hess had stated would begin in March related to unexcused and excused absences was being implemented January 18, 2016 instead.  Specifically, Coleman's email detailed the new policy as follows:

    > PTO:  - Paid time off must be scheduled and approved at least 5 days in advance. Depending on the circumstance (i.e., illness, dr. appt.), you may use your PTO. However, all unscheduled absences will be unexcused.  If you do not have PTO, requests for days off will be denied unless sufficient documentation is provided, explaining the cause of your absence. I have attached a copy of the Centric PTO Guidelines above for your viewing.

32. The Centric PTO Guidelines were not attached to the email, but Mr. Gonzales eventually received a copy. The 2016 Centric Guide includes PTO on Page 25. Nowhere in the PTO Guidelines does it state, "If you do not have PTO, requests for days off will be denied unless sufficient documentation is provided, explaining the cause of your absence."  Mr. Gonzales asked for clarification from Centric Director of Human Resources LaMartina, but was not provided clarification. Mr. Gonzales asked Tech Support Manager Coleman also for further clarification but it was not provided. Mr. Gonzales asked Coleman why the plan was implemented earlier than was represented by Centric HR Representative Hess, and Coleman replied that Brian Dietert wanted to move forward now with the policy change.

33. Mr. Gonzales was concerned because two weeks prior to the January 18, 2016 change in policy, he had requested 2 days off which were approved for a January 22, 2016 doctor's appointment and January 25, 2016 personal appointment.  Mr. Gonzales appointment on the 25th was denied, and Coleman informed Mr. Gonzales that any further absences would be held against him per Brian Dietert.  Mr. Gonzales was later told by Coleman verbally that his time off was approved for the 25th. When the 25th came, he received notice that the absence was in fact

unexcused.

34. On January 27, 2016, Mr. Gonzales was given his annual performance review. Mr. Gonzales' review reflected that he needed improvement in following policies and procedures. The same policy and procedures he was listed as failing to follow were the ones he had requested clarification from and that had changed. He had asked for clarification from Tech Support Manager Coleman, Human Resources Representative Hess, Centric Director of Human Resources LaMartina, and Director of Telecommunications Dietert. Mr. Gonzales was informed that due to his performance review of "needs improvement," he was going to be denied a salary raise.

35. Mr. Gonzales developed panic attacks, anxiety, and depression as a result of the threats of violence, denial of leave, and threats of termination against him. As a result, Mr. Gonzales was constructively discharged on or around May 5, 2016.

36. At the time of his constructive discharge, Mr. Gonzales made $19.67 an hour and worked 20-25 hours overtime a month at a rate of $29.51. Mr. Gonzales earned at least $48,191.50 a year.

37. Mr. Gonzales worked 25 to 35 hours of overtime a month, but was only paid for 20 to 25 hours of overtime per month. Plaintiff alleges he entitled to at least $3541.20 a year in unpaid overtime, and a like amount in liquidate damages, for a total of $7,082.40 per year with Defendant.

38. There being no legitimate reason otherwise, Mr. Gonzales alleges that he was constructively discharged because of his disability and his FMLA requests.

**V.**
**DISCRIMNATION AND RETALIATION BASED ON DISABILITY UNDER THE TEX. LABOR CODE §21.051, et seq**

39. The acts committed by the agents, servants and/or employees of the Defendant in discriminating and retaliating against Plaintiff constitute violations of Tex. Labor Code §21.051, et seq., including 21.051, 21.055, 21.056.

40. Moreover, Plaintiff had faithfully served Defendant in his capacity as an employee and faithfully performed all duties expected of him. Plaintiff alleges that he was constructively discharged and treated differently based on his disability. Plaintiff herein contends Defendant generally violated the spirit of and intent of the Labor Code, including 21.051, in that Defendant terminated or otherwise discriminated against Plaintiff.

41. Defendant intentionally discriminated and retaliated against Mr. Gonzales by subjecting him to the unlawful discriminatory actions described above.

42. As a result of the unlawful discriminatory actions of Defendant as described above, Mr. Gonzales has suffered, and will continue to suffer actual damages in the form of lost wages, medical and mental health costs, both past and future, and lost employment benefits.

43. As a result of Defendant's unlawful disability discrimination, Mr. Gonzales has suffered compensatory damages by reason of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

44. Plaintiff further alleges that he asked for a reasonable disability accommodation and Defendant failed to engage in the interactive process.

45. Further, others outside the protected class were treated more favorably than Plaintiff.

**<u>Discrimination based on Disability</u>**

46. The evidence will demonstrate:
    a. Plaintiff belongs to a protected class as Disabled (Back injury);
    b. Plaintiff was qualified for his position;

    c.   Plaintiff was subject to adverse employment action(s); and

    d.   There is an inference of disability discrimination.

## VI.
## DISCRIMINATION, INTERFERENCE, AND RELATIATION UNDER THE FAMILY MEDICAL LEAVE ACT

47. Plaintiff re-alleges and incorporates the allegations contained above as if fully stated herein.

48. Plaintiff has satisfied all jurisdictional prerequisites in connection with his claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et. seq.

49. Defendant is an "employer" as defined by the FMLA in 29 U.S.C. § 2611(4).

50. Defendant employed, and continues to employ, fifty or more persons at, or within a seventy-five (75) mile radius of, the location where Plaintiff worked. Thus it is believed Defendant was covered by the FMLA.

51. During the time that Plaintiff was employed by Defendant, he was an "eligible employee" as defined by the FMLA in 29 U.S.C. § 2611(2).

52. Plaintiff worked for Defendant for more than twelve (12) months, and for more than 1250 hours during that twelve-month period. Plaintiff had not taken twelve (12) weeks of off work for a serious health condition, or otherwise, during the twelve-month period prior to the onset of his serious health condition. Thus, it is believed Plaintiff was covered by the FMLA.

53. While Plaintiff was employed by Defendant, Plaintiff had an illness or medical condition that can be defined as a "serious health condition" under the FMLA as outlined in 29 U.S.C. § 2611(11).

54. Plaintiff was entitled to medical leave in order to care for his serious health condition as provided for in the FMLA (in 29 U.S.C. § 2612(a)(1)(D)).

55. Defendant has repeatedly interfered with Plaintiff's ability to take FMLA, which is prohibited under 29 U.S.C. § Section 2615(a).

56. Defendant further retaliated against Plaintiff for requesting intermittent FMLA for his spouse's serious health condition by terminating his employment.

57. As a result of Defendant's violations of the FMLA, Plaintiff has suffered actual damages in the form of lost income and benefits (past and future), in an amount that has not yet been fully established, but which will be provided at time of trial.

## VII.

## RETALIATION AND FAILURE TO PAY WAGES IN ACCORDANCE WITH THE FAIR LABOR STANDARDS ACT

58. The FLSA was passed by Congress in 1938 in an attempt to eliminate low wages and long hours and to correct conditions that were detrimental to the health and well-being of workers. To achieve its humanitarian goals, the FLSA "limits to 40 a week the number of hours that an employer may employ any of his employees subject to the Act, unless the employee receives compensation for his employment in excess of 40 hours at a rate not less than one and one-half times the regular rate at which he is employed." ***Walling v. Helmerich & Payne***, 323 U.S. 37, 40 (1944) (discussing the requirements of 29 U.S.C. § 207 (a)).

59. Defendant's failure to pay overtime and/or forcing Plaintiff to work any off the clock hours or suffer deductions for partial days violated the Fair Labor Standards Act of 1938 as currently amended and codified at 29 U.S.C. §201 et seq. (FLSA). Therefore, Plaintiff is entitled to recover regular and/or overtime pay for each hour worked off the clock and/or in excess of 40 hours during any one work week at the rate of one and one half times his hourly rate and is entitled to reimbursement for any improper deductions.

60. Plaintiff would show that the FLSA violations were willful and as such Plaintiff is entitled to accrued, unpaid overtime pay. Plaintiff is further entitled to liquidated damages in an amount equal to the overtime benefits due because of the willful nature of the Defendant's failure to take reasonable steps to comply with the FLSA. Plaintiff is also entitled to recover mandatory attorneys' fees under the statute.

61. During the relevant period, Defendants have violated and are violating the provisions of Sections 6 and 7 of the FLSA, 29 U.S.C. §§ 206-7, and 215(a)(2), by employing employees in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA as aforesaid, for workweeks longer than 40 hours without compensating such employees for their work in excess of forty hours per week at rates no less than one-and-a-half times the regular rates for which they were employed. Defendants have acted willfully in failing to pay Plaintiff in accordance with the law.

62. At all material times, Defendants have acted, directly or indirectly, in the interest of an employer or joint employer with respect to Plaintiff.

63. At all times hereinafter mentioned, Defendants have been an employer within the meaning of the Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

64. At all times hereinafter mentioned, Defendants have been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

65. At all times hereinafter mentioned, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprises have had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and

in that said enterprises have had and have an annual gross volume of sales made or business done of not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated).

66. At all times hereinafter mentioned, Plaintiff was an individual employee who was engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. §§ 206-207.

67. The evidence will also show that Defendant's reason(s) for taking adverse employment actions against Plaintiff's employment are pretextual.

68. WHEREFORE, cause having been shown, Plaintiff prays for judgment against Defendants as follows:

   a. For an Order pursuant to Section 16(b) of the FLSA finding Defendants liable for unpaid back wages and overtime due to Plaintiff and for liquidated damages equal in amount to the unpaid compensation found due to Plaintiff; and

   b. For an Order awarding Plaintiff the costs of this action;

   c. For an Order awarding Plaintiff attorneys fees; and

   d. For and Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

   e. For an Order granting such other and further relief as may be necessary and appropriate.

## VIII.
## RESPONDEAT SUPERIOR

69. Employees involved in the discrimination and retaliation described herein were at all times employees, agents, or representatives of the Defendant and were at all times acting in the course and scope of that employment. Whenever in this complaint it is alleged that the Defendant did any act or thing, it is meant that the Defendant's officers, agents, servants,

employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, or representatives. Accordingly, Defendant is liable for such conduct under the doctrine of *respondeat s*uperior.

## IX.
## DAMAGES

70. Plaintiff alleges that as a direct and proximate result of the conduct and/or omissions on the part of the Defendant, he is entitled to recover at least the following legal damages:

    a. Lost wages, past and future;

    b. Mental anguish, suffering, and emotional distress suffered in the past;

    c. Mental anguish, suffering, and emotional distress which, in all reasonable probability, will be suffered in the future;

    d. Compensatory damages and punitive damages in the maximum amount allowed by law;

    e. Pecuniary losses;

    f. Punitive damages;

    g. Reasonable attorney fees, expert fees and costs; and

    h. For any other relief to which Plaintiff is entitled.

71. Based upon the above enumerated damages, the Plaintiff pleads for actual damages for the above damage elements in an amount the jury deems reasonable under the circumstances which is an amount within the jurisdictional limits of this Court.

## X.
## ADMINISTRATIVE FILINGS

72. Plaintiff filed his complaint with the Equal Employment Opportunity Commission and the

Texas Workforce Commission, Civil Rights Division alleging that the Defendant had committed an unlawful employment action against Plaintiff and that he suffered discrimination, harassment and retaliation based on disability.

73. The claims filed with the Equal Employment Opportunity Commission are considered dually filed with the Texas Workforce Commission under the Texas Commission on Human Rights Act claims. Plaintiff has received a right to file suit from the Texas Workforce Commission, Civil Rights Division, providing Plaintiff with 60 days from the date of the receipt of the notice.

74. Plaintiff timely filed his lawsuit.

## XI.
## ATTORNEY FEES

75. Defendant's conduct as described in this petition and the resulting damage and loss to Plaintiff has necessitated Plaintiff's retaining counsel. Plaintiff is entitled to attorney's fees under Chapter 21 of the Texas Labor Code, the Fair Labor Standards Act, and the Family Medical Leave Act. Therefore, Plaintiff seeks all reasonable and necessary attorney fees.

## XII.
## JURY DEMAND

76. Plaintiff further demands a trial by jury. A jury fee has been tendered.

## XIII.
## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that a judgment be rendered for Plaintiff and against the Defendant, for the actual damages set out above in an amount the jury deems reasonable under the circumstances, but in an amount within the jurisdictional limits of the court as of the time of filing suit in this matter, along with costs of court, pre-judgment and post-judgment interest as allowed by law, any injunctive or declaratory relief as requested above, attorney's' fees, and for such other and further relief to which Plaintiff may be justly entitled.

**Respectfully Submitted,**

**BY: /s/ THOMAS N. CAMMACK, III**
   **ADAM PONCIO**
   **STATE BAR NO. 16109800**
   **THOMAS N. CAMMACK, III**
   **STATE BAR NO. 24073762**
   **ALAN BRAUN**
   **STATE BAR NO. 24054488**

**PONCIO LAW OFFICES**
A Professional Corporation
5410 Fredericksburg Road, Suite 109
San Antonio, Texas 78229-3550
Telephone:    (210) 212-7979
Facsimile:    (210) 212-5880

**ATTORNEYS FOR PLAINTIFF**
**WILLIE GONZALES**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day July 2017, electronically filed the foregoing with the

Clerk of the Court and served on the following interested parties:

Raven Applebaum
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
112 East Pecan Street, Suite 2700
San Antonio, TX 78205
Telephone: 210-277-3626
Fax: 210-277-2702
raven.applebaum@ogletree.com

   */s/ Thomas N. Cammack, III*
   **THOMAS N. CAMMACK, III**